UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

JPMORGAN CHASE BANK, N.A.,

Plaintiff,

- against -

RONA MAURER, ROSE ROSEMAN, SHIRLEY WATSTEIN, LISA M. BISHOP, DONNA WARD, MONA POH TAY a/k/a POH C. TAY, NICOLE LEGUIZAMO a/k/a JUSTINE LEGUIZAMO, NICOLE MAURER, ANDREA ZAUFLICK and "JOHN DOE #1" through "JOHN DOE #12", the last twelve names being fictitious and unknown to the plaintiff, the persons or parties intended being the persons or parties, if any, having or claiming an interest in or lien upon the property described in the complaint,

Defendants.

---------------------------------------------------------------------X

AMENDED ANSWER AND AFFIRMATIVE DEFENSE

13-CV-3302 (NRB)

**ANSWER OF DEFENDANTS LISA M. BISHOP, SHIRLEY WATSTEIN AND POH C. TAY TO INTERPLEADER COMPLAINT, WITH ANSWER TO THE CROSS-CLAIMS OF DEFENDANT RONA MAURER**

Defendants LISA M. BISHOP, SHIRLEY WATSTEIN and POH C. TAY, by their attorney, LAWRENCE H. SILVERMAN, for their Amended Answer to the interpleader complaint of the plaintiff and Answer and Affirmative Defense to the cross-claims of defendant Rona Maurer, allege as follows:

## ANSWER

1. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraphs 2, 3, 9, 10, 11, 18, 19, 20, 22, 25, 26, 27, 29, 30,32, 33 and 34.

2. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 except admit that the amount in controversy is greater than

$500.00 and Watstein and Bishop reside in states other than the State of New York.

3. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraphs 21, 24 and 31 and respectfully refer to the letter referenced therein for the true content and meaning thereof.

**ANSWER TO THE CROSS-CLAIM OF RONA MAURER AGAINST THE ANSWERING DEFENDANTS**

4. Deny knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2, 3, 4, 6, 7, 8, 9, 10, 11 and 12 of Rona Maurer's cross-claim.

5. Deny the allegations set forth in paragraphs 13, 14, 17, 20, 21, 22, 23, 25 and 26.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE ON BEHALF OF LISA M. BISHOP, SHIRLEY WATSTEIN AND POH C. TAY**

6. Rona Maurer's cross-claim against the answering defendants is barred by New York's statute of limitations.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE ON BEHALF OF LISA M. BISHOP, SHIRLEY WATSTEIN AND POH C. TAY**

7. The allegations of Rona Maurer's second cross-claim fails to state facts upon which relief may be granted.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE ON BEHALF OF LISA M. BISHOP, SHIRLEY WATSTEIN AND POH C. TAY**

8. Rona Maurer's second cross-claim is barred by New York's statute of limitations.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE ON BEHALF OF LISA M. BISHOP, SHIRLEY WATSTEIN AND POH C. TAY**

9. Jack E. Maurer (the "decedent") was born on March 8, 1918.

10. At all times relevant herein, the decedent was a resident of the State of New York,

residing at 145 Central Park West, New York, New York.

11. At all times relevant herein, the decedent was married to defendant Rona Maurer ("Rona") in the State of New York on or about November 19, 1965.

12. At all times relevant herein, the decedent had one surviving issue of a prior marriage, plaintiff LISA BISHOP.

13. At all times relevant herein, the decedent had two issue of his marriage to Rona, Nicole Maurer-St. John ("Nicole") and Justine Leguizamo ("Justine").

14. Upon information and belief, in December 2000, among other things, the decedent owned all of the issued and outstanding shares of stock appurtenant to Apartment 5-C at 145 Central Park West, in the City and State of New York (the "Apartment") and held title in fee absolute to a residence in the Village of Quiogue, State of New York (the "House").

15. Upon information and belief, the value of the Apartment and the House in July 2001, exclusive of furnishings exceeded twenty million dollars ($20,000,000.00).

16. Upon information and belief, sometime during the year 2000, the decedent began suffering short-term memory loss.

17. Upon information and belief, in or about December, 2000, the decedent was evaluated by Norman Relkin M.D., a professor at Cornell University Medical College and an expert in the diagnosis and treatment of cognitive impairments.

18. Upon information and belief, in or about December, 2000, Dr. Relkin diagnosed the decedent as having a mild cognitive impairment.

19. Upon information and belief, as a result of his findings and diagnosis, Dr. Relkin prescribed medication known as Aricept.

20. Upon information and belief, at that time, Rona met with Dr. Relkin, discussed his findings, the prescribed medication and the need for her to supervise the decedent's medication routine.

21. Upon information and belief, in or about 2000 and through June 2001, Rona made no attempt to encourage or supervise the decedent's taking of the prescribed medication.

22. Upon information and belief, in or about 2000 and through June 2001, Rona informed the decedent and others that she would not encourage or supervise his taking of the prescribed medication or be involved in any other manner with his care.

RONA'S DEMANDS, ABUSE AND NEGLECT

23. Upon information and belief, in or about 2000 and through June 2001, after the diagnosis by Dr. Relkin, Rona declared to others and demanded that the decedent transfer to her his ownership of the Apartment and the House.

24. Upon information and belief, in or about 2000 and through June 2001, Rona repeatedly demanded of the decedent and declared to others, in words or in substance, "I've got to have everything in my name."

25. Upon information and belief, in or about 2000 and through June 2001, Rona engaged in a persistent course of harassment and abuse of the decedent, characterized by relentless screaming and demands that the Apartment and the House be put in her name.

26. Upon information and belief, the aforesaid pattern of harassment and abuse was observed by others.

27. Upon information and belief, in or about 2001 and prior to July 11, 2001, Rona declared to others, in words or in substance, "Once I have everything in my name, I promise to be nice to him and to take care of him."

28. Upon information and belief, prior to July 11, 2001, the decedent was told by others that Rona's abusive behavior would stop once he signed the papers she wanted.

RONA HIRES THE LABATON FIRM

29. Upon information and belief, in June 2001, RONA consulted Jeffrey A. Galant ("Galant") and/or Anne Farber ("Farber") of the law firm Goodkind Labaton Rudoff & Sucharow, LLP (the "Labaton firm") for the purpose of obtaining title to and securing control over the decedent's assets.

30. Upon information and belief, shortly thereafter, under Rona's direction, Farber began preparing documents for the purpose of giving Rona control over the decedent's assets.

31. Upon information on or about June 28, 2001, the Labaton firm sent via facsimile a proposed retainer agreement to Rona for both Rona and the decedent to sign which, among other things, contained a provision waiving any conflict of interest.

32. Upon information and belief, according to notes kept by Farber in the ordinary course of business, Rona told Farber that upon receipt of the proposed retainer agreement on June 29, 2001, the decedent objected to it as unnecessary and refused to sign it.

33. Upon information and belief, notwithstanding the decedent's objection, and without the decedent's knowledge or consent, Rona forged the decedent's name to the retainer agreement (Exhibit "A") and signed her own name.

34. Upon information and belief, on or about July 3, 2001, according to notes kept by Farber in the ordinary course of business, Rona represented to Farber that "[the decedent] signed the engagement letter. . ." and that it was in the mail.

35. On December 10, 2007, Forensic Document Examiner, Detective Richard T.

Picciochi, Ret., a 22-year veteran of the Police Department of the City of New York responsible for training and supervising personnel in the Questioned Document Unit, determined that the decedent's signature on the June 28, 2001 retainer agreement was forged, probably by Rona. A copy of Detective Picciochi's report and credentials is annexed hereto as Exhibit "B."

36. Upon information and belief, subsequent to delivering the forged retainer agreement, Rona continued to interact with the attorneys at the Labaton firm to prepare legal documents relating to the decedent's House, Apartment and retirement funds.

37. At the request of Rona, the decedent paid the legal fees of the Labaton firm for the aforesaid work.

THE EXECUTION OF ESTATE PLANNING DOCUMENTS

38. Upon information and belief, on or about July 11, 2001 at a meeting at the Labaton firm offices, Rona and attorneys at the Labaton firm informed the decedent that documents were prepared giving Rona a life estate in the Apartment and House for the purpose of financial and estate tax planning to save income taxes and inheritance taxes.

39. Upon information and belief, pursuant to the aforesaid representations and Rona's promises to cease her abusive behavior, among other documents, the decedent executed a document entitled "The Jack E. Maurer July 11, 2001 Agreement" (hereinafter, the "Agreement") dated July 11, 2001 consisting of five numbered pages with an additional execution page, annexed hereto as Exhibit "C".

40. Among the documents which Rona's attorneys presented to the decedent was an agreement limiting his right to withdraw from his IRA account which was then held by Smith Barney. The Agreement also provided that upon his death all of the proceeds would go to Rona

however should she predecease him, he was still not free to withdraw the funds and upon his death the remainder was required to go to the issue of his marriage to Rona to the exclusion of his daughter from his first marriage, Lisa Bishop. The significance of this Agreement to the pending case is that after its execution, the decedent executed the beneficiary designation under which the defendants in this lawsuit have made their claims. Said designation is annexed hereto as Exhibit "D".

41. At that time of the execution of Exhibit "C" the decedent was in poor health, was physically and mentally weak and was completely dependent on those around him.

42. At that time of the execution of Exhibit "C" as a result of his physical and emotional condition, the decedent was frightened and was susceptible to being easily influenced.

43. Upon information and belief, the representations made as to the purposes of the Agreement were false when made and were made to induce the decedent, among other things, to limit his access to his life savings.

44. Upon information and belief, after his execution of the Agreement, the decedent became aware that it restricted his right to change beneficiaries of the IRA or ESOP.

45. Upon information and belief, it was never the decedent's intention to limit his ability to change beneficiaries of his IRA or ESOP.

46. Upon information and belief, after the execution of the Agreement, the decedent became aware that they were not planned or prepared in furtherance of financial or estate tax planning objectives, but rather solely for the benefit of Rona.

47. Upon information and belief, subsequent to the execution of the Agreement, Rona objected to the decedent obtaining from the Labaton firm copies of the file documents related to the preparation and execution of Exhibit "C".

48. Upon information and belief, by reason of his age, poor physical condition and fears associated with his declining mental condition, the Rona took unfair advantage of, and exercised undue influence over the decedent.

THE SIGNIFICANCE OF RONA'S FORGERY OF THE RETAINER AGREEMENT

49. Upon information and belief, as a result of Rona's forgery and deceit, the attorneys at the Labaton firm:

a. were led to believe that the decedent executed the retainer agreement and conflict waiver therein,

b. failed to take into consideration adequately the decedent's age, health, memory and his unwillingness to transfer his assets as previously reported to it by Rona and Nicole,

c. failed to take into consideration adequately the contentious relationship between Rona and the decedent, as reported to it by Rona and Nicole,

d. failed to meet with the decedent as a prospective client of the Labaton firm prior to the execution of the Agreement,

e. failed to adequately communicate with the decedent,

f. failed to adequately disclose in advance the significance of the conflict waiver provision in the retainer agreement with the decedent and the implications of dual representation,

g. failed to speak with the decedent on the telephone prior to the execution of the Agreement,

      h.     failed to make an assessment whether the decedent's reasonable financial needs could be met given the restrictions contained in the Agreement,

      i.     failed to send a draft or summary of the proposed agreements to the decedent prior to the execution of the Agreement,

      j.     did not contact the decedent's attorney, Alan Kroll, Esq. to determine in what capacity he represented the decedent,

      k.     accepted as true, and acted upon, all of the statements and directions of Rona,

      l.     did not discern that Rona was hostile to the decedent,

      m.     did not discern that Rona was conniving to take absolute title and control of the decedent's property to the detriment of their issue,

50.    In summary, upon information and belief, Rona's forgery of the retainer agreement was essential for the execution of the Agreement. Absent her wrongdoing, it would not have been signed. Her forgery deprived the decedent of the independent representation to which he was entitled.

    WHEREFORE, defendants respectfully request the following relief:

      (1)     judgment dismissing Rona Maurer's cross-claims with costs and disbursements awarded to the answering defendants, and

      (2)     that an order be issued directing the plaintiff to distribute to LISA M. BISHOP, SHIRLEY WATSTEIN and POH C. TAY the amounts due to

hem pursuant to the beneficiary designations together with interest, costs and disbursements; and granting such other and further relief as may be just and proper.

Dated: Commack, New York
August 14, 2015

LAWRENCE H. SILVERMAN (LS 2353)
Attorney for Defendants
LISA M. BISHOP
SHIRLEY WATSTEIN
and POH C. TAY
350 Veterans Memorial Hwy
Commack, New York 11725
(631) 543-5434